**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAMES EDWARD HARDY,
*Petitioner-Appellant*,

v.

KEVIN CHAPPELL,
*Respondent-Appellant.*

No. 13-56289

D.C. No.
2:11-cv-07310-VAP-PJW

ORDER AND
AMENDED OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted October 20, 2015
Pasadena, California

Filed August 11, 2016
Amended January 27, 2017

Before: Harry Pregerson and Consuelo M. Callahan,
Circuit Judges, and Stanley Allen Bastian, District Judge.[*]

Order;
Dissent to Order by Judge Bea;

---

[*] The Honorable Stanley Allen Bastian, District Judge for the U.S. District Court for the Eastern District of Washington, sitting by designation.

Opinion by Judge Bastian;
Dissent by Judge Callahan

## SUMMARY[**]

### Habeas Corpus

The panel amended an August 11, 2016, opinion reversing the district court's judgment denying a habeas corpus petition challenging convictions for two counts of first degree murder and one count of conspiracy to collect life insurance proceedings; denied a petition for panel rehearing; and denied on behalf of the court a petition for rehearing en banc.

Judge Bea – joined by Judges O'Scannlain, Gould, Tallman, Bybee, Callahan, M. Smith, Ikuta, N.R. Smith and Owens – dissented from the denial of rehearing en banc. Judge Bea wrote that (1) in finding that the California Supreme Court applied an incorrect standard to determine whether the petitioner was prejudiced by undisputed ineffective assistance of counsel, the panel majority fly-specked some of the court's language and denigrated other language that clearly stated its use of the proper standard; and (2) in deciding that the California Supreme Court's conclusion that the petitioner was not prejudiced was based on unreason rather than compelling evidence in the record, the panel majority abandoned any notion of the proper deference owed to a state court's judgment under AEDPA.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Elizabeth Richardson-Royer (argued), Deputy Federal Public Defender; Hilary Potashner, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Petitioner-Appellant.

Colleen M. Tiedemann (argued), Deputy Attorney General; Kenneth C. Bryne, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee

**ORDER**

The opinion filed on August 11, 2016 is amended as follows:

> Slip Opinion page 4: change "the apartment of Clifford" to "the home of Clifford"

> Slip Opinion page 5: change "lived in an apartment complex on Vose Street" to "lived in a home on Saticoy Street"

> Slip Opinion page 5: change "Reilly also lived in the Vose Street apartments." to "Reilly lived in an apartment complex on Vose Street in Van Nuys."

> Slip Opinion page 5: change "Morgan's apartment" to "Morgan's home"

4                           HARDY V. CHAPPELL

    Slip Opinion page 8: change "entered the
apartment" to "entered the home"

    Slip Opinion page 9: change "Morgan's
apartment" to "Morgan's home"

    Slip Opinion page 17: change "Morgan's
apartment" to "Morgan's home"

Judges Pregerson and Bastian have voted to deny the
petition for panel rehearing and have recommended denying
the petition for rehearing en banc. Judge Callahan has voted
to grant the petition for panel rehearing and petition for
rehearing en banc.

The full court was advised of the petition for rehearing en
banc. A judge requested a vote on whether to rehear the
matter en banc. The matter failed to receive a majority of
votes of the nonrecused active judges in favor of en banc
consideration. Fed. R. App. P. 35.

The petition for panel rehearing and the petition for
rehearing en banc are **DENIED**. No future petitions for
rehearing will be entertained.

BEA, Circuit Judge, with whom O'SCANNLAIN, GOULD, TALLMAN, BYBEE, CALLAHAN, M. SMITH, IKUTA, N.R. SMITH, and OWENS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

Two years ago, the Supreme Court reversed a judgment of this court where we had failed to give the proper deference owed to a state-court habeas decision under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254. *See Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015). Last year, we followed *Davis* in upholding a state-court decision where "its invocation of the *Strickland* prejudice standard might have been ambiguous but was not clearly incorrect." *Mann v. Ryan*, 828 F.3d 1143, 1147 (9th Cir. 2016) (en banc). The panel's decision departs from the instruction of *Davis* and its implementation in *Mann*. This case ought to have been reheard en banc for two reasons.

First, a divided panel of this court found that a unanimous California Supreme Court decision by Justice Werdegar applied an incorrect standard to determine whether habeas petitioner James Edward Hardy ("Hardy") was prejudiced by the undisputed ineffective assistance of trial counsel. The panel majority got there by out-of-context "fly-specking" some of that court's language, and denigrating other language that clearly stated its use of the proper standard.

Second, perhaps recognizing the weakness of its argument that the California Supreme Court had applied the wrong standard, the panel majority pivoted to its secondary argument that, assuming the state court had applied the correct standard, its application of that standard was unreasonable. The state court had determined that Hardy was not prejudiced by the ineffective assistance of counsel

because the state produced ample evidence that Hardy
conspired to kill the victims to obtain life insurance proceeds
and aided and abetted the commission of the murders. In
deciding that the California Supreme Court's conclusion was
based on unreason, rather than the compelling evidence in the
record, the majority simply abandoned any notion of the
proper deference owed to a state court's judgment under
AEDPA.

Both of the majority's determinations are contrary to
repeated Supreme Court instructions to us as to how we must
treat state-court decisions in our interpretation and application
of AEDPA. I respectfully dissent from our refusal to rehear
this case en banc.

## I.  Factual and Procedural History

The background of this case is important for appreciating
how far the majority exceeded the limited scope of its review
under AEDPA. Clifford Morgan ("Morgan") devised a plan
to have his wife and son killed so he could collect on their life
insurance policies. *In re Hardy*, 163 P.3d 853, 860 (Cal.
2007). He enlisted Mark Anthony Reilly ("Reilly") to help
with the plan. *Id.* Reilly at first failed to recruit Calvin Boyd
("Boyd") to participate in the murders. *Id.* According to the
state, Reilly then recruited appellant Hardy to help commit
the murders. *Id.* Sometime in the night of May 20–21, 1981,
multiple assailants went to Morgan's home, cut a chain lock
with bolt cutters, and stabbed Morgan's wife and son to
death. *Id.*

Hardy, Reilly, and Morgan were tried together in Los
Angeles County Superior Court. *Id.* at 862. Hardy was
represented by Los Angeles County Deputy Public Defender

Michael Demby ("Demby"). *Id.* Hardy and Reilly were convicted of two counts of first degree murder, one count of conspiracy to commit murder to collect life insurance proceeds, and several special-circumstance allegations.[1] *Id.* at 863. In the penalty phase, Hardy and Reilly were both sentenced to death. *Id.* at 859.

Hardy filed a habeas petition in the California Supreme Court, alleging ineffective assistance of counsel by Demby and requesting relief as to the penalty phase. *Id.* at 863. The California Supreme Court ordered the state to show cause why Hardy was not entitled to penalty phase relief because Demby had failed to call available mitigation witnesses. *Id.* at 864. Upon the California Supreme Court's order, a referee heard evidence that incriminated Boyd in the murders (the "Boyd evidence"). *See id.* at 867–81. The referee entered findings of fact and conclusions of law, which found Demby performed deficiently when he failed to investigate and present evidence that Boyd had done the stabbing and was the actual killer. *See id.* at 864, 885. Based on the factual findings in the referee's report, Hardy filed a second petition for a writ of habeas corpus arguing that evidence from that hearing also required guilt-phase relief. *Id.* at 859.

The California Supreme Court consolidated Hardy's petitions for penalty-phase and guilt-phase relief. *Id.* In a unanimous opinion authored by Justice Werdegar, the court granted Hardy's petition to vacate the judgment of the penalty phase. *Id.* at 895. For his guilt-phase relief petition, the

---

[1] Morgan was also convicted of capital murder charges, but his case was severed from the other two co-defendants for the penalty phase because of his failing health. *In re Hardy*, 163 P.3d at 863. Morgan died of bone cancer before the penalty phase of his separate trial. *Id.*

California Supreme Court agreed with Hardy that Demby's performance was constitutionally deficient under the *Strickland v. Washington*, 466 U.S. 668, 687 (1984), standard. *See In re Hardy*, 163 P.3d at 884–85. However, the court also found that Hardy *did not* suffer prejudice therefrom in the guilt phase. *Id.* at 891. The court reasoned that, even though the Boyd evidence may have cast doubt on Hardy's role as the killer who stabbed the victims to death, there had been ample evidence at trial to convict Hardy of first degree murder on a conspiracy theory, *id.* at 888–90, and on an aiding-and-abetting theory, *id.* at 890–91. As the court stated,

> After weighing this evidence and considering what petitioner's trial would have looked like had he been represented by competent counsel, we conclude that although there is a reasonable probability the jury would not have convicted petitioner on the prosecution's proffered theory that he was the actual killer, ample evidence remains that petitioner was guilty of the murders on the alternative theories that he conspired with, and aided and abetted, Reilly, Morgan and others to commit the murders.

*Id.* at 891 (citation omitted).[2]

---

[2] Perhaps this case would not even be here had Justice Werdegar inserted "on the other hand, there is no reasonable probability the jury would have acquitted on the prosecution theories of conspiracy and aiding and abetting because ample evidence remains that petitioner was guilty of the murders on the alternative theories." But can the second part of that paragraph be read any other way?

Hardy then filed a habeas petition in the United States District Court for the Central District of California. A magistrate judge issued a report and recommendation denying Hardy's claims. *Hardy v. Martel*, 2013 WL 3223392 at *1 (C.D. Cal. June 24, 2013). The district court accepted the report, entered judgment denying the petition, and issued a certificate of appealability as to "[w]hether the state supreme court reasonably concluded that Hardy was not prejudiced as a result of his counsel's failure to uncover and expose the fact that a key government witness, Calvin Boyd, was probably the person who committed the murders." *Id.* (alteration in original).

A majority of the panel voted to reverse the district court's judgment. The majority held that the California Supreme Court had applied a standard contrary to clearly established law in analyzing *Strickland* prejudice because the opinion uses the words "substantial evidence" at certain points in describing the evidence in the record.[3] Analyzing Hardy's *Strickland* claim de novo, the panel held that Hardy was prejudiced in the guilt phase by Demby's deficient performance. In the alternative, assuming the California Supreme Court applied the correct standard, the majority held that Justice Werdegar's application of the *Strickland* prejudice prong was unreasonable.

---

[3] Tellingly, the majority opinion does not mention Justice Werdegar's use of the phrase "ample evidence" three times to describe the strong evidence that Hardy was guilty because of the derivative theories of liability.

## II. Justice Werdegar Applied the Correct Prejudice Standard

The majority's claim that Justice Werdegar used an incorrect standard—that she weighed evidence to see whether it constituted "substantial evidence" to determine whether prejudice as defined by *Strickland* existed—is inconsistent with her language elsewhere and her methodology throughout the opinion. She properly applied *Strickland*'s reasonable probability standard to determine whether prejudice resulted from the ineffective assistance of counsel in failing to investigate and to properly cross-examine Boyd.

First, she unquestionably stated the proper, *Strickland* prejudice standard and the majority opinion so recognized:

> Second, he must also show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to **undermine confidence in the outcome**."

*In re Hardy*, 163 P.3d at 883–84 (emphasis added) (citations omitted) (quoting *In re Avena*, 909 P.2d 1017, 1032–33 (Cal. 1996)); *see also Strickland*, 466 U.S. at 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

She then started her analysis of whether Hardy had proved prejudice by correctly explaining the three relevant

elements of the *Strickland* prejudice analysis in the particular context of Demby's deficient performance.

> *(1) What evidence was available that counsel failed reasonably to discover?*
>
> *(2) How strong was that evidence?*
>
> *(3) How strong was the evidence of guilt produced at trial?*

As to the first element, she found in favor of Hardy: "Subtracting Boyd's testimony, the evidence that petitioner was the actual killer was weak and circumstantial." *Id.* at 886. She also found in favor of Hardy as to the second element. Properly presented, the Boyd evidence would have shown that "the evidence that petitioner committed the murders was much weaker," so that there was a reasonable probability the jury would not have convicted him as the actual killer of the two Morgans. *Id.* at 890.

But as to the third element, the evidence of guilt on the alternative theories of (1) conspiring to commit the murders and (2) aiding and abetting the commission of the murders, the evidence was indeed strong and was not undermined by Boyd's testimony. "[H]e [petitioner] was **strongly linked to the conspiracy**." *Id.* (emphasis added). Justice Werdegar provided a detailed discussion of the linkage:

> "According to Debbie Sportsman [the then-girlfriend of Reilly, the codefendant on the murder charges], Reilly began associating with Hardy around May 10, 1981. She testified that the two men had many private

conversations during this period and often drank and took drugs together. On the evening of May 20, 1981, the night of the killings, Debbie met with Hardy and Reilly at the latter's apartment. Reilly spoke with Morgan on the telephone and asked him if he wanted to go through with the killing. Morgan, who was in Carson City, answered that he did." Petitioner thereafter discussed his alibi with Colette Mitchell [Hardy's then-girlfriend] "all the time," and he coordinated his alibi with Reilly as well. According to Colette, petitioner knew several details about the crimes, including that the assailants had used a tool to cut the chain lock, that life insurance proceeds were the reason for the killing, that the money was collecting interest, and that Reilly was in charge. Most incriminating was petitioner's receipt of $1,000 in $100 bills after the murders, his instruction to Colette to dispose of his shoes on learning that police might have discovered some footprints at the crime scene, and his direction to dispose of the M–1 carbine rifle allegedly stolen from the Morgan home. Even discounting petitioner's inconsistent statements to Colette about whether he had participated in the actual killing, there is **ample evidence showing he participated in the plan to kill the victims as part of a wider conspiracy** to defraud the insurance companies.

*Id.* (emphasis added) (citation omitted) (quoting *People v. Hardy*, 825 P.2d 781, 796 (Cal. 1992)). Justice Werdegar relied on this **ample evidence**[4] of Hardy's role in the conspiracy, in contradistinction to the weak evidence that he was the actual stabber, in concluding that Demby's deficient performance did not prejudice Hardy as to the verdict of guilt.

Her conclusion is reasonable if one considers what the evidence of Boyd's perfidy—left on the cutting room floor by trial counsel—accomplished. That evidence showed that Hardy did not wield the knife, Boyd did. But the evidence unearthed about Boyd did *nothing* to rebut the evidence of Hardy's participation in the conspiracy and his aiding and abetting. As Justice Werdegar fulsomely relates, "such deficient representation nevertheless does not require reversal of the guilt judgment because counsel's failure to investigate did not **undermine** the prosecution's theory that petitioner *conspired* to commit the murders, and such conspiracy rendered petitioner liable for first degree murder irrespective of the possibility that a third party actually killed the victims." *Id.* at 859–60 (bolded emphasis added). And again,

> But this [Boyd] evidence does not **undermine**[5] other critical evidence, such as the testimony of Colette Mitchell, who testified petitioner told her he was going to

---

[4] As noted above, the California Supreme Court opinion described this derivative liability evidence as "ample" when it expressly weighed the evidence by the reasonable-probability standard. *See In re Hardy*, 163 P.3d at 890.

[5] Note the use of the precise term used in *Strickland* —"undermine confidence"—to measure what constitutes prejudice under *Strickland. See Strickland*, 466 U.S. at 694.

steal something from someone to enable the
collection of insurance proceeds;[6] that he had
been to the victims' home the night of the
murders; that he knew the crime was to be
accomplished by cutting the chain on the
door; that he received $1,000, apparently for
his participation in either the conspiracy or the
murders themselves; that Morgan was not
worried about the delay the trial caused
because his money was earning interest while
he was in jail; or that people who said the
murder was committed by more than one
person were wrong because he "[knew] for a
fact it was one." The referee's findings also
**do not fatally undermine** Colette's testimony
regarding petitioner's suspicious instructions
to her to help dispose of both the stolen M–1
carbine rifle and his shoes. That petitioner
went to the victims' home *with Reilly and
Boyd* is also possible. In short, although the
weight and breadth of the evidence showing
Boyd participated in the murders is disturbing,
**such evidence does not fatally undermine**
the prosecution's entire case against
petitioner.

*Id.* at 883 (alteration in original) (bolded emphasis added). It
was the fact that the Boyd evidence did not **undermine** the
conspiracy and aiding-and-abetting convictions—not that

---

[6] During the event, the perpetrators took an M–1 rifle from the Morgan
home and cut a chain lock with bolt cutters to make it look as if a forcible
entry and burglary had occurred. Actually, Reilly gained entry to the
Morgan home with a key from Mr. Morgan.

the conspiracy and aiding-and-abetting evidence was "substantial"—which drove the state court's decision that there was no prejudice under the *Strickland* "undermining" test for prejudice. "Undermine confidence in the outcome" is the proper *Strickland* test and the one used by Justice Werdegar, as shown by her repeated use of the term "undermine" when *weighing* the evidence. Moreover, the California Supreme Court quite clearly applied the correct *Strickland* standard when it concluded its prejudice analysis:

> Because petitioner would have been convicted of two first degree murders on these two theories of derivative liability irrespective of Demby's unreasonable failure to investigate and present evidence of the Boyd connection, petitioner fails to demonstrate he would have achieved a more favorable outcome at the guilt phase had Demby competently investigated the Boyd connection. Accordingly, we conclude petitioner fails to demonstrate prejudice at the guilt phase flowing from Demby's deficient representation.

*Id.* at 891 (citing *Strickland*, 466 U.S. at 687–88).

As Judge Callahan noted in dissent, we recently reaffirmed that, in habeas cases, when "it is possible to read the state court's decision in a way that comports with clearly established federal law . . . we must do so." *Hardy*, 832 F.3d at 1144 (Callahan, J. dissenting) (alterations in original) (quoting *Mann*, 828 F.3d at 1157–58). We follow this approach because the Supreme Court has made clear that "[a] readiness to attribute error is inconsistent with the

presumption that state courts know and follow the law. It is also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (citations omitted) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)).

This is not a case where we really need to give the California Supreme Court "the benefit of the doubt." But instead of following the Supreme Court's clear instructions, the majority went out of its way to find fault with the opinion. Ignoring Justice Werdegar's careful reasoning for finding no prejudice, the majority focused exclusively on the opinion's use of the term "substantial evidence." According to the majority, Justice Werdegar applied a "substantial evidence" standard to determine that Hardy suffered no prejudice from Demby's performance.

But Justice Werdegar was not *weighing* the evidence by a "substantial evidence" standard. Instead, she used the term "substantial evidence" six times to explain that *extensive and compelling* evidence supported the prosecution's theory that Hardy was guilty of murder because he conspired with, and aided and abetted, others to commit the murders. She characterized this derivative liability evidence as "substantial" in contradistinction to her assessment that the evidence that Hardy was the actual stabber was weak and undermined by the Boyd evidence.[7] As noted above, she also

---

[7] The opinion makes this point clear when it explains that the court would be required to vacate the murder convictions *if* the court were *considering only the actual stabber theory*. *In re Hardy*, 163 P.3d at 888. But vacating the convictions is not necessary, according to the court,

stated that this derivative liability evidence was "ample." The majority's assertion that Justice Werdegar's opinion weighed the critical evidence related above by whether it was "substantial" rather than whether this evidence precluded a reasonable probability of a different result is not a fair reading of the opinion.

### III.    Justice Werdegar's Application of the *Strickland* Prejudice Standard Was Reasonable

Perhaps recognizing the weakness of its argument that the California Supreme Court applied the incorrect standard, the majority equivocated and suggested that, even if the California Supreme Court had applied the correct standard, its application of that standard was unreasonable. According to the majority, if Demby had presented the Boyd evidence, the prosecution's theory that Hardy was the actual stabber would have been undermined. Therefore, in the majority's estimation, this reasonable doubt as to Hardy's role as the actual stabber would have also changed the jury's view of Hardy's guilt as a co-conspirator and as an aider and abettor of the murders.

But the majority's eagerness to find that the California Supreme Court opinion was an unreasonable application of the *Strickland* prejudice standard also conflicts with established Supreme Court precedent. In *Harrington v. Richter*, 562 U.S. 86 (2011), this court had granted a habeas petition after trial counsel for the petitioner failed to present

---

because the prosecutor also proceeded on the derivative theories of liability, and petitioner could not show prejudice as to the verdict because of the evidence which amply supported those theories of guilt. *Id.*

expert testimony on blood evidence that would have bolstered the petitioner's theory of the case. *Id.* at 97. The Supreme Court reversed and noted that the petitioner had not established *Strickland* prejudice because "[t]here was ample basis for the California Supreme Court to think any real possibility of Richter's being acquitted was eclipsed by the remaining evidence pointing to guilt." *Id.* at 113.

As explained above, Justice Werdegar did not abuse the broad discretion established by AEDPA in finding that the compelling evidence of conspiracy and aiding-and-abetting guilt precluded a finding of *Strickland* prejudice. That evidence was both "substantial" and "ample." The girlfriends of Hardy and Reilly at the time, Collette Mitchell and Debbie Sportsman respectively, testified to Hardy's close association with Reilly in the weeks leading up to the murder. Sportsman testified that Hardy was with Reilly when Reilly spoke on the phone with Morgan and Morgan confirmed he wanted the killings to happen. Mitchell testified that Hardy had detailed knowledge of the crime's execution, that Hardy received money for his role in the murders, and that Hardy tried to dispose of physical evidence linking him to the crime scene. Even if we would reach a different conclusion as to whether Hardy was prejudiced by Demby's performance, it was not unreasonable for Justice Werdegar to conclude that— correctly applying the *Strickland* prejudice standard—this highly incriminating evidence precluded a reasonable probability of a different jury verdict. The panel majority failed to appreciate this essential point when it decided that its interpretation of the paper record was the only reasonable conclusion.

## V. Conclusion

The Supreme Court has repeatedly admonished this court that it should not reverse reasonable state-court decisions on habeas review. The majority nit-picked a unanimous opinion that repeatedly quoted *Strickland* in order to conclude that the California Supreme Court did not apply the long-settled and well-known prejudice standard for ineffective-assistance-of-counsel cases. The majority also decided that, if the California Supreme Court in fact applied what it said it was applying, then the California Supreme Court acted unreasonably by not accurately imagining how the jury would have reacted to the Boyd evidence. The majority's unacknowledged reinterpretation of AEDPA deference is in conflict with precedents of the Supreme Court and this court.

I respectfully dissent from our failure to rehear this case en banc.

---

## OPINION

BASTIAN, District Judge:

During the night of May 20, 1981, someone entered the home of Clifford and Nancy Morgan and brutally stabbed Nancy Morgan and their eight-year-old son to death. According to the State of California, that someone was James Edward Hardy. The State argued that theory at trial, obtaining a conviction and death sentence for Hardy. As it turns out, that someone was likely Calvin Boyd, a key prosecution witness at Hardy's trial. Yet Hardy remains imprisoned, serving a life sentence.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") raised the standard of review for petitioners, greatly limiting the success rate of petitions for writs of habeas corpus.[1] Despite the demanding standard set by AEDPA for state inmates, this case does not present a close question—Hardy is entitled to a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

### Factual and Procedural History[2]

Clifford Morgan (hereinafter "Morgan") lived in a home on Saticoy Street in Van Nuys, California, with his wife, Nancy, and their eight-year-old son. Morgan devised a sinister plan to have his wife and son killed so he could collect on their life insurance policies. He enlisted the help of Mark Anthony Reilly. Reilly lived in an apartment complex on Vose Street in Van Nuys. Reilly agreed to Morgan's plan and sought a partner for the murders. In exchange for this help, Morgan allowed Reilly to live in Morgan's home and promised to allow Reilly to manage a bar that Morgan intended to open with the insurance proceeds.

After failing to recruit a kickboxer named Marc Costello, Reilly turned to another Vose Street resident, Calvin Boyd,

---

[1] *See, e.g.*, John H. Blume, *AEDPA: The "Hype" and the "Bite*," 9 CORNELL L. REV. 259 (2006); Lee Kovarsky, *AEDPA's Wrecks: Comity, Finality, and Federalism*, 82 TUL. L. REV. 443 (2007); Judith L. Ritter, *The Voice of Reason—Why Recent Judicial Interpretations of the Antiterrorism and Effective Death Penalty Act's Restrictions on Habeas Corpus are Wrong*, 37 SEATTLE U. L. REV. 55 (2013).

[2] The factual and procedural summary is taken from the district court's order. The district court relied on the Supreme Court of California. *In re James Edward Hardy*, 41 Cal. 4th 977, 983–87 (2007) (*Hardy II*).

and Boyd's friend Marcus. According to Boyd's trial testimony, Boyd eventually declined to participate in the murders because Reilly was unable to pay him with either money or cocaine in advance. According to the State, Reilly then tried to recruit Hardy, telling two friends that Hardy might assist him in the crime.

In May 1981, Morgan moved to Carson City, Nevada, ostensibly for business reasons but likely to establish an alibi. During the night of May 20 or morning of May 21, two people, allegedly Hardy and Reilly, used bolt cutters and a key to enter the Morgan residence. Nancy Morgan and her son were sleeping in a back bedroom. Both were stabbed to death. Experts testified that physical evidence suggested at least two persons were responsible for the slayings, which likely occurred between 3:30 and 5:30 a.m.

Michael Mitchell, Reilly's roommate, testified that he returned to the Vose Street apartments and went to sleep sometime after 11:00 p.m on May 20, 1981. Around midnight, he awoke and saw Hardy, Reilly, Colette Mitchell (no relation to Michael Mitchell), and Steven Rice (another neighbor) in the apartment that he shared with Reilly. Later, he heard male voices and heard the shower being used. The next morning, he observed wet towels in the bathroom, but he saw no evidence of blood.

Shortly after the murders, Reilly admitted his guilt to his then-girlfriend Debbie Sportsman and made incriminating statements to her. He told Sportsman that Nancy Morgan said "[p]lease don't kill me," that more than one perpetrator was involved, that bolt cutters had been used to cut the chain lock on the door, and that a fish knife had been used in the stabbings.

Morgan's recent purchase of an unusually large amount of life insurance raised suspicions, as did two incriminating statements he made to a neighbor—that his wife was worth more dead than alive, and that he expected she would die before him. Sportsman's testimony linked Reilly to Morgan and human blood was found on Reilly's shoes. No physical evidence was found that linked Hardy to the murders. The evidence against Hardy consisted largely of the testimony of Calvin Boyd and Colette Mitchell.

Calvin Boyd was the State's key witness. He testified that shortly after the murders, Reilly admitted that he and Hardy were the killers. Boyd stated Reilly had showed him recently purchased bolt cutters. Boyd claimed he walked through Rice's apartment the morning of the murders and saw Reilly and Hardy both sleeping—placing the two men together shortly after the crime. Boyd also saw Rice and Colette Mitchell (hereinafter "Mitchell") in the apartment.

Mitchell was Hardy's girlfriend at the time of the murders but not at the time of trial. She gave testimony indirectly linking Hardy to the crime. Her initial statements to law enforcement provided Hardy with an alibi, but she changed her story and admitted to perjury. Mitchell contacted Hardy in jail intending to assist him even after she was granted immunity for her testimony. At trial, Mitchell testified she was working at a restaurant on the night of the murders. Hardy, Reilly, and Rice met at the restaurant shortly after 9:00 p.m. and Mitchell served them drinks. They went to the Vose Street apartments around 10:00 p.m. to "party" and use cocaine. Mitchell admitted to doing several large lines of cocaine and drinking at least three beers via a "beer bong." Mitchell testified to quarreling with Hardy and leaving Reilly's apartment to go next door. Sometime between

midnight and 2:00 a.m., Rice and Mitchell left the apartments to purchase more beer. After returning, Hardy sought her out at Rice's apartment and told her not to leave because he needed her that night. Despite having an unusually large amount of cocaine—which often would keep her awake—she passed out in Rice's apartment and did not wake until 11:00 a.m. the next day. When she awoke, Hardy was asleep next to her and Reilly was asleep on a sofa.

Mitchell initially told police she had been with Hardy the entire night. At trial, she claimed she was either asleep or passed out for most of the night and did not know if Hardy left the apartment or not. Mitchell claimed Reilly once told her that he and Hardy had left the apartment while she slept but that another time Reilly told her they had not left. Mitchell testified she and Hardy discussed his alibi "all the time." Mitchell stated Hardy led her to believe he was going to steal something from someone to enable a third person to collect on an insurance policy. Hardy supposedly told her at least twice that he had been to the victims' home on the night of the murders. Hardy claimed he knew the victims were alive when he was there because he heard them snoring. On another occasion, Hardy told Mitchell the victims had already been killed by the time he entered the home. Mitchell testified that Hardy said "we were at the house," but she also stated that he told her "he didn't do it." Mitchell testified that Reilly admitted to her that he knew who the killer was and it was not Hardy.

Mitchell claimed Hardy said a chain on a door would be cut to give the crime the appearance of a robbery. According to Mitchell, Hardy was to receive a portion of $40,000 or $50,000, but he actually only received $1,000. Mitchell testified she, or someone else, put the $1,000 in a cedar box.

Mitchell said Hardy made several other statements: Morgan was not worried about the trial because during the delay his insurance proceeds were earning interest; the less she knew about the crime the better off she would be; Reilly was in charge of the situation; Hardy knew for a fact only one person committed the murders; Hardy took something from Morgan's home to make it look like a robbery; and the killers used bolt cutters. According to Mitchell's testimony, Hardy asked her and Hardy's brother to retrieve and dispose of an M1 carbine from Hardy's apartment; a firearm of the same style was reported missing from the crime scene. Mitchell also testified that Hardy asked her to destroy some of his shoes after he learned police found a shoeprint at the scene.

At trial, Hardy's attorney, Michael Demby, gave no opening statement and presented no evidence on Hardy's behalf. The jury was instructed that individuals who directly and actively committed the act constituting the crime, those who aided or abetted the commission of the crime, and those who advised and encouraged its commission were equally guilty. An additional aid-and-abet instruction was also given.

Hardy, Reilly, and Morgan were convicted of two counts of first degree murder and one count of conspiracy to commit murder to collect life insurance proceeds. Six special circumstances were found by the jury. The defendants were not convicted on a burglary charge. A joint penalty phase was held for Hardy and Reilly—both were sentenced to death. Morgan died of cancer before he could be sentenced.

On appeal, the California Supreme Court vacated one of the special circumstances but affirmed the judgment in all other respects. The United States Supreme Court denied a

petition for writ of certiorari. *Hardy v. California*, 506 U.S. 987 (1992).

On July 26, 1991, Hardy filed a petition for writ of habeas corpus in the California Supreme Court. That court issued an order to show cause why Hardy was not entitled to penalty phase relief because his trial counsel failed to call available mitigation witnesses. On April 28, 1993, the California Supreme Court ordered the Los Angeles County Superior Court to hold a reference hearing and make findings of fact.

The superior court judge heard evidence over several months in 1996 and 1997, where a very different story than the one presented at trial emerged. According to a number of credible witnesses, Boyd made very incriminating statements after the murders, Boyd's alibi for the night of the murders was a sham, and Hardy had refused to participate in the crimes.[3] On September 16, 1999, the superior court entered findings of fact and conclusions finding Demby performed deficiently when he failed to investigate and present evidence that (a) Calvin Boyd, a key prosecution witness, was the actual killer, and (b) the murders occurred at a time when Hardy could not have been present.

On May 3, 2000, Hardy filed his Supplemental Allegation to Conform the Pleadings to the Proof, arguing that evidence from the reference hearing also required guilt phase relief.

---

[3] Specifically, the superior court judge found Boyd had admitted his guilt telling a friend "yes, man, I went in to do the lady in and Marcus and I were stumbling through the house, and I went through one room, I tripped upon the kid and grabbed a pillow and put it over his face and stabbed him." The California Supreme Court explicitly adopted this finding.

The California Supreme Court issued an order directing the State to show cause why Hardy was not entitled to reversal of his conviction "because he is innocent of the capital crimes of which he was convicted, because a third party named Calvin Boyd committed the murders, and because [Hardy's] trial counsel rendered constitutionally ineffective assistance of counsel by failing to present evidence demonstrating [Hardy's] innocence." Both of Hardy's state habeas petitions were consolidated for argument and opinion.

On July 26, 2007, the California Supreme Court decided the consolidated petitions. Although that court recognized that the disturbing revelations about Boyd "presented a more difficult decision for the jury and may well have created in the minds of the jurors a reasonable doubt as to petitioner's guilt," it found Hardy could not meet the very difficult burden of an actual innocence claim. *Hardy II*, 41 Cal 4th at 1017–18. As to ineffective assistance of counsel, the California Supreme Court granted Hardy's claim that Demby's performance was deficient at both the penalty and guilt phases of the trial. The court reversed Hardy's death sentence but found Demby's inadequate representation at the guilt phase did not prejudice Hardy because there was "substantial evidence" to convict him under an aid-and-abet or conspiracy theory. *Id.* at 1029–30 ("We conclude substantial evidence supports the theory that petitioner was guilty of first degree murder on a conspiracy theory."). The court also rejected Hardy's actual innocence claim.

The California Supreme Court order specifically adopted several factual findings from the reference hearing, including: (1) Raynell Burney, Rickey Ginsburg, James Moss, Sandra Moss, Michael Small, and Steven Rice testified credibly regarding various incriminating statements and actions made

by Boyd; (2) Boyd was not a credible witness; (3) Boyd habitually carried a knife similar to the murder weapon; (4) Boyd had previously committed several assaults with a knife; (5) Boyd had cuts on his hands after the killings; (6) Boyd's alibi was false; (7) Boyd had motive to commit murder; (8) Boyd testified falsely when he stated at trial that the prosecutor had not promised him anything in connection with his testimony when he was actually granted immunity; and (9) Boyd likely had a role in the murders, very possibly a primary one.

After the State chose not to retry the penalty phase, Hardy was resentenced to consecutive terms of life in prison without the possibility of parole. He was resentenced to twenty-five years to life on the conspiracy charge.

On September 6, 2011, Hardy timely filed a pro se petition for writ of habeas corpus in the United States District Court for the Central District of California. A magistrate judge ordered responsive briefing but denied Hardy's request for appointment of counsel. On May 7, 2013, the magistrate issued a report and recommendation denying all claims. On June 24, 2013, the district court accepted the report and entered judgment denying the petition. The district court issued a certificate of appealability as to "[w]hether the state supreme court reasonably concluded that Hardy was not prejudiced as a result of his counsel's failure to uncover and expose the fact that a key government witness, Calvin Boyd, was probably the person who committed the murders." This appeal was timely filed.

### Standards of Review

A district court's decision to grant or deny a habeas corpus petition under 28 U.S.C. § 2254 is reviewed de novo. *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007); *Shumway v. Payne*, 223 F.3d 982, 984 (9th Cir. 2000). Facts found by the district court are reviewed for clear error. *Tapia v. Roe*, 189 F.3d 1052, 1055 (9th Cir. 1999).

AEDPA applies because the petition was filed after the passage of that law. *Jeffries v. Wood*, 103 F.3d 827, 827 (9th Cir. 1996). Under AEDPA, relief may only be granted if the state court decision in question was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(1)–(2).

### Analysis

The question now is whether the California Supreme Court decision was contrary to, or involved an unreasonable application of, clearly established federal law. The answer is yes; the California Supreme Court decision was contrary to established federal law. Alternatively, we also conclude that the California Supreme Court decision was an unreasonable application of clearly established federal law.

### I.

The "clearly established federal law" for an ineffective assistance of counsel claim under the Sixth Amendment derives from *Strickland v. Washington*. 466 U.S. 668 (1984); *see Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) ("There is

no dispute" that *Strickland* is clearly established federal law). *Strickland* established a two-part test: the defendant must show (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687.

The first prong of *Strickland* is not contested here. The California Supreme Court concluded that Demby rendered deficient performance by failing to investigate and present evidence that Boyd was likely the actual killer.[4] Because neither party questions this conclusion, this Court need only review the findings under the second prong of *Strickland*, which the parties contest.

Under § 2254(d)(1), "contrary to" means "substantially different from the relevant precedent" of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). As an example, the Supreme Court explained that if a state court denied an ineffective assistance of counsel claim for failure to show prejudice by a preponderance of the evidence standard rather than by a reasonable probability of a different result standard, the state court's ruling would be "contrary to" the clearly established federal law in *Strickland* because the state court would be applying a stricter standard. *Id.* 405–06. This case presents a nearly identical set of circumstances.

---

[4] The State, with its more abundant resources, should also have discovered Boyd's role in the crime. Instead, the State concealed the existence of an immunity agreement with Boyd granted Boyd immunity and used him as its key witness against Hardy. The prosecutor's conduct in this case raises substantial concerns regarding the reliability of Hardy's conviction even apart from the Demby's inadequate representation.

The California Supreme Court held that Hardy did not demonstrate the level of prejudice required under *Strickland*. The court concluded that even without Boyd's testimony, and even if Demby had proven to the jury that Boyd was the actual murderer, substantial evidence remained to permit a jury to find Hardy guilty of murder under an aid-and-abet or conspirator theory.

Although the California Supreme Court recited the *Strickland* standard, it concluded that because there was "substantial evidence" against Hardy he suffered no prejudice from Demby's deficient performance. This was not the correct standard, and consequently, the relevant question regarding prejudice at the guilt phase was never properly addressed.

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[5] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). By applying this standard, the state court created a much higher bar for Hardy than the law required. Under *Strickland*, the court must ask "whether there is a reasonable probability that, absent the errors [by counsel], the factfinder would have had a reasonable doubt respecting guilt." 466 U.S. at 695. A reasonable probability is "sufficient to undermine confidence in the outcome" and must be

---

[5] Substantial evidence is also the standard California courts use in reviewing factual and credibility determinations made by a referee during a reference hearing. *In re Cox*, 30 Cal. 4th 974, 998 (2003). Here, the California Supreme Court properly applied the standard in that portion of its opinion concerning the reference hearing. Whether counsel's deficient performance prejudiced Hardy, however, is not subject to the substantial evidence standard and is independently reviewed.

substantial, not just conceivable. *Id.* at 693–94. This standard does not mean a petitioner must demonstrate "that counsel's actions more likely than not altered the outcome." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citing *Strickland*, 466 U.S. at 693) (internal quotation marks omitted). Requiring a habeas petitioner to demonstrate that had counsel performed adequately there would not have been sufficient evidence for a jury to convict is more akin to a Fed. R. Crim. P. 29 motion for a judgment of acquittal and has no place in the *Strickland* test. To the extent that the California Supreme Court found the *Strickland* prejudice prong was not met because substantial evidence remained to convict Hardy under a different theory, it applied a standard contrary to clearly established federal law.

This case differs substantially from *Mann v. Ryan*. No. 09-99017, — F.3d — , 2016 WL 3854234 (9th Cir. July 15, 2016) (en banc). In *Mann*, this Court found that the state court's opinion was ambiguous as to whether it was employing the proper *Strickland* standard. *Id*. at *11. The most logical inference in *Mann*, however, was that the state court judge—who was also the original sentencing judge—applied the proper standard but recited the standard incorrectly. Hardy's case presents the inverse. Here, the state court correctly recited the *Strickland* standard but then, in its application, abandoned it—replacing it with a substantial evidence standard. As the Supreme Court has made clear, it is the application, not the recitation of a standard that matters for § 2254(d) purposes. *See Sears v. Upton*, 561 U.S. 945, 952 (2010) (per curiam) ("Although the Court appears to have stated the proper [*Strickland*] prejudice standard, it did not correctly conceptualize how that standard applies to the circumstances of this case.") (footnote omitted). It is apparent on the surface of the California Supreme Court's decision that

it applied an incorrect standard and no inferences need be, nor can be drawn, that could result in finding the state court applied the proper standard. *See Mann*, 2016 WL 3854234 at *11.

Hardy's petition satisfies the "contrary to" clause of § 2254(d)(1) because the California Supreme Court employed a standard of review which was significantly harsher than the clearly established test from *Strickland*. *Id.* ("Had the state post-conviction court applied [a stricter standard] to analyze [Petitioner's] ineffective assistance of counsel claims, its opinion would have been contrary to clearly established federal law under AEDPA."). Because the state court used the wrong standard, we need not defer to that decision. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) (explaining that when § 2254(d)(1) is satisfied, a court may review a petition "unencumbered by the deference AEDPA normally requires"). In other words, this Court may analyze Hardy's constitutional claim de novo pursuant to § 2254(a). *Frantz v. Hazey*, 533 F.3d 724, 735–37 (9th Cir. 2008) (explaining the two step process under AEDPA).

## II.

Under de novo review, Hardy was clearly prejudiced in the guilt phase by Demby's deficient performance. Had Demby properly investigated and presented evidence that Boyd—the state's key witness—actually committed the murders, there is a substantial probability the jury would have come to a different conclusion. Hardy is entitled to habeas relief because the California Supreme Court applied a standard contrary to clearly established law and because his attorney's deficient performance was prejudicial at the guilt phase.

At trial, the State's theory of the case centered on the existence of an "elaborate scheme or plan or design by Mr. Morgan[,] coupled with Mr. Reilly as the middleman[, which] culminated in the hiring of Mr. Hardy or the agreement by Mr. Hardy to go with Mr. Reilly to do the killing." That is, Morgan hired Reilly to kill his family, Reilly then recruited Hardy, and the two entered Morgan's home where Hardy killed Morgan's wife and son. The State argued that Boyd and his friend Marcus had originally been enlisted to burglarize the Morgan residence but had ultimately withdrawn from the scheme.

According to the California Supreme Court, Boyd provided "two critical pieces of evidence" at trial: (1) Boyd testified that Reilly told Boyd that Hardy was the killer, and (2) Boyd saw Hardy and Reilly together just a few hours after the murder at Rice's apartment.

Most of the other evidence presented against Hardy at trial came from Mitchell. Sportsman also testified that Hardy and Reilly spent a lot of time drinking and doing drugs together during the weeks surrounding the murders.

We note that the California Supreme Court actually did address the prejudicial effect of Demby's performance but only in relation to Hardy's actual innocence claim—not as to his ineffective assistance claim. The California Supreme Court found the weight and breadth of the evidence regarding Boyd's likely participation in the murder "would have presented a more difficult decision for the jury and may well have created in the minds of the jurors a reasonable doubt as to [Hardy's] guilt." The evidence regarding Boyd's likely participation—which included evidence Boyd made incriminating statements before and after the murder, had a

false alibi, carried a knife similar to the murder weapon, and had previously committed assaults—is precisely the same evidence that Hardy argues Demby should have investigated and presented at trial. The fact that the California Supreme Court acknowledged, in relation to Hardy's innocence claim, how such evidence would have created a reasonable doubt as to Hardy's guilt is equally applicable to Hardy's ineffective assistance of counsel claim.

Nonetheless, the California Supreme Court held Hardy was not entitled to relief on the ineffective assistance of counsel claim because substantial evidence supported a theory Hardy was guilty of first degree murder on a conspiracy theory and on an aid-and-abet theory. Because Hardy was found guilty on a conspiracy charge, and because an aid-and-abet jury instruction was given along with the murder charge, the California Supreme Court concluded no prejudice occurred. Under de novo review, the California Supreme Court clearly erred.

First, as noted, the State's entire theory of the case hinged on Hardy being the actual killer. Under no reasonable reading of the record could it be concluded the jury actually found Hardy guilty under an aid-or-abet theory. When the prosecutor addressed the aid-and-abet theory in his closing argument, he described only Morgan's and Reilly's involvement—*not* Hardy's. Although the jury instruction regarding the murder charge included an aid-and-abet instruction and the jury found Hardy guilty of the murder charge, an aid-and-abet theory is wholly distinct[6] from an

---

[6] We do not suggest that a prosecutor can never present factually inconsistent theories. Rather, we emphasize that here the prosecutor presented just one theory to the jury: Hardy was the actual killer.

actual killer theory and the jury could not simultaneously have found both true.[7] Had Demby presented evidence that Boyd was the killer it would have completely undermined the prosecution's theory of the case. As a result, there is a significant likelihood the jury would not have found that Hardy was guilty of murder beyond a reasonable doubt.

Further, the California Supreme Court found that "[e]vidence of Boyd's incriminating admissions, coupled with other evidence, could have convinced a reasonable jury to entertain some doubt as to the extent of [Hardy's] participation in the murders." The California Supreme Court also stated that had Boyd's participation been revealed at trial it would have "throw[n] some doubt on the scope of [Hardy's] role—said by the prosecutor at trial to be a primary one—in the crimes." These statements indicate the state court believed a jury would have seriously questioned what role, if any, Hardy had in the murders, including under an aid-and-

---

[7] In *Taylor v. Beard*, this court rejected a petitioner's argument that because the jury found him guilty of being the actual shooter, it could not find him guilty of aiding and abetting. 811 F.3d 326, 327 (9th Cir. 2016) (en banc) (petition for cert. filed). Hardy's case is distinguishable from *Taylor* because Taylor was making a "freestanding innocence" claim and the additional evidence he presented tended to inculpate him further. *Id*. at 333–34. Hardy's *Strickland* claim, however, has a much more yielding standard. Additionally, Taylor was tried alone, a jury agreed on every element of the crime that Taylor essentially admitted to committing, and his jury did not need to agree unanimously on the theory presented. *Id.* at 332 (citing *Schad v. Arizona*, 501 U.S. 624, 631–32 (1991)). In contrast, Hardy was tried with two other co-defendants who were alleged to be the aiders-and-abettors and Hardy was tried as the actual killer. Because of the critical differences in the standards that apply to an actual innocence claim versus the *Strickland* claim in this case and the dissimilar trial procedures used in these two cases, *Taylor* does not control this case.

abet theory, had Demby not performed deficiently as Hardy's attorney.

Second, although Hardy was found guilty by the jury of conspiracy to commit murder for insurance proceeds, his conviction rested on being the actual killer. The California Supreme Court found the jury relied—at least in part—on a conspiracy theory in convicting Hardy and that sufficient evidence supported the theory. This theory fails for the same reasons the aid-and-abet theory fails. The prosecution argued Hardy was a member of the conspiracy because he agreed to, *and actually did*, commit the murders.[8] Any remaining evidence linking Hardy to other minor acts involved in the conspiracy does little to rebut that the prosecution's theory at trial would have been eviscerated had Demby not been deficient.

Additionally, there was at least some evidence adopted by the California Supreme Court that, even if Hardy was involved in the conspiracy at one point, he may have withdrawn from the conspiracy before the commission of the crimes. Hardy may have backed out before the crime was committed because, according to Boyd, Hardy was too "chicken shit to go along." Whether this withdrawal would have occurred before any overt acts were taken—and therefore been effective—is unclear but it is additional evidence adopted by the state court that would cause a jury to view the conspiracy charge differently. Again, whether the jury could have or even likely would have convicted Hardy

---

[8] In his opening statement, the prosecutor stated that "there is no doubt in anyone's mind or ought to be that Mr. Hardy had the knife in his hand and plunged that knife into the bodies of those two people in excess of 65 times."

under this theory of conspiracy is irrelevant; what matters is the substantial likelihood the jury may not have convicted Hardy had Demby investigated and presented evidence about Boyd's participation in the crime.

Third, even if the aid-or-abet and conspiracy theories of guilt could supplant what the jury found at trial—that Hardy was the actual killer—it is reasonably likely the jury would have had a reasonable doubt under those theories based on the evidence that should have been presented at trial. The California Supreme Court's contrary conclusion was incorrect and is unsupported by the record. According to the state court, the substantial evidence that remained to convict Hardy under derivative theories consists almost entirely of Mitchell's testimony and a few circumstantial statements made by Sportsman.

In support of its finding, the California Supreme Court cites Sportsman's testimony linking Reilly to the murders. Sportsman testified that the day after the murders she saw Reilly and Hardy laughing and drinking. Sportsman also testified that Reilly encouraged her to speak to Hardy and Mitchell to coordinate alibis. According to Sportsman, Hardy and Reilly started drinking and doing drugs together ten days before the murders.

Beyond Sportsman's testimony, the California Supreme Court relied solely on Mitchell to provide the "substantial evidence" that Hardy is guilty under a derivative theory. Mitchell testified that Hardy discussed his alibi frequently and that Hardy knew several details about the crimes. Most incriminatingly—according to the California Supreme Court—was that Hardy possessed $1,000 in $100 bills after the murders and that he instructed Mitchell to dispose of his

shoes and an M1 carbine. The state court, however, recognized the weakness of Mitchell's testimony—discounting most of it point-by-point. The court noted Mitchell "did not know where the money came from, could not remember who informed her of the money's origin, and could not remember the first time she saw the money." The California Supreme Court added "[t]he persuasive power of [Mitchell's] testimony was further undermined by the fact she was subject to impeachment due to her drug and alcohol use and that she admitted lying for [Hardy] at his preliminary hearing."

The California Supreme Court found that Sportsman's and Mitchell's testimony *could* support a finding that Hardy was guilty under a derivative theory assuming the jury found the testimony credible and persuasive. As previously explained, however, this is not the correct standard. The question is whether, if Demby had not performed deficiently, it is reasonably likely the jury would have reached a different outcome. Although the federal district court concluded that the jury specifically found Mitchell credible and relied on her testimony, this conclusion was purely speculative and not supported by the record. *See Strickland*, 466 U.S. at 695 ("[E]vidence about the actual process of decision, if not part of the record of the proceeding under review . . . should not be considered in the prejudice determination."). At least one juror stated that the jury specifically discussed Mitchell's testimony and determined she was not credible. Further, Mitchell's testimony would have been discounted by the jury had Demby presented evidence that Boyd's testimony, which corroborated much of Mitchell's testimony, was false.

The California Supreme Court described Boyd's crucial role in Hardy's trial calling it "extremely damaging to

[Hardy's] case" and stating that he provided evidence "on which the prosecution relied to convict [Hardy]." Removing Boyd's extremely damaging testimony and its corroborating effect on Mitchell's testimony would have significantly changed the case as presented to the jury. Despite some evidence remaining that Hardy may have somehow been involved in the murders under a derivative theory, had Demby not performed deficiently, there is a substantial likelihood the jury would have had a reasonable doubt concerning Hardy's guilt.

Last, *Strickland*'s prejudice prong requires analyzing the evidence that would have been presented had counsel not performed deficiently. *Bonin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995). *Strickland* held:

> a court hearing an ineffectiveness claim must consider the totality of the evidence before the . . . jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by the errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant

has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

466 U.S. at 695–96. *Strickland* does not permit the court to reimagine the entire trial. We must leave undisturbed the prosecution's case. We only envision what Demby should have presented in Hardy's defense and determine how that would have altered the trial. In doing so, we may not invent arguments the prosecution could have made if it had known its theory of the case would be disproved.

Here, this means the State would have called Boyd to the stand to testify that Hardy was the actual killer. Then Demby would have cross-examined Boyd, revealing compelling evidence that Boyd, not Hardy, was the actual killer. Though we might assume the State would attempt to rehabilitate Boyd as a witness, we cannot simply presume it would have been successful in doing so. Nor can we presume the State would have altered the entire theory of its case in response or been successful doing so. If the State had changed horses midstream, that alone would have created a substantial probability the jury would come to a different result. Demby's failure to investigate Boyd's role in this case altered the entire evidentiary picture. Viewing the trial in this manner, the California Supreme Court and the federal district court erred in finding there was no reasonable probability that the outcome would have been different but-for the deficient performance of counsel under any theory of conviction.[9]

---

[9] The *Strickland* test is clear, and it is not a sufficiency of the evidence standard nor is it a substantial evidence standard. The dissent incorrectly suggests otherwise and fails to address or analyze how the deficient

This is not a case where counsel's deficient performance had no bearing on the outcome due to otherwise strong or overwhelming evidence of guilt. *See, e.g.,United States v. O'Neal*, 937 F.2d 1369, 1376 (9th Cir. 1990) (no prejudice where there was strong evidence of guilt), *abrogated on other grounds by United States v. Garcia-Cruz*, 40 F.3d 986, 989 (1994); *United States v. Harden*, 846 F.2d 1229, 1232 (9th Cir. 1988) (no prejudice where there was overwhelming evidence of guilt). Instead, the verdict was only weakly supported by the evidence. No witness except Boyd placed Hardy at the scene of the crime, no witness reported seeing Hardy leaving the apartment complex the night of the crime, and no blood, fingerprint, footprint, hair, or other forensic evidence linked Hardy to the crime. No murder weapon was found and no evidence was presented that linked Hardy to any knife similar to the one used by the killers. Indeed, no physical evidence whatsoever linked Hardy to the crime. Hardy was convicted of being the actual killer primarily on the strength of Boyd's now discredited testimony. It cannot be reasonably argued that strong or overwhelming evidence of guilt under any theory exists without Boyd's testimony. Thus, there is a substantial likelihood that the jury would not have convicted Hardy had Demby performed effectively.

## III.

Even though the California Supreme Court *recited* the proper *Strickland* prejudice standard, it failed to *apply* the proper standard, and thus the decision is not protected from review for 28 U.S.C. § 2254(d) purposes. *See Sears*, 561 U.S. at 952 (2010). Assuming, however, that the California

---

performance by attorney Demby fundamentally prejudiced Hardy on all theories of criminal liability.

Supreme Court did correctly conceptualize and apply the *Strickland* prejudice standard but simply camouflaged that understanding with a different—and incorrect—phrasing of the legal standard, we still conclude that its application was unreasonable.

Prior to the passage of AEDPA, federal courts reviewed state court convictions for habeas consideration using a standard akin to de novo review. *See Brown v. Allen*, 344 U.S. 443, 500–03 (1953). AEDPA revised the standard of review limiting a federal court's review of state court decisions which are "contrary to, or involved an unreasonable application of, clearly established Federal law." § 2254(d).

Three distinct terminologies have emerged to describe the "unreasonable application" portion of § 2254(d). The Supreme Court has described this standard as objective unreasonableness, double deference, and the fairminded jurist test. Although this may appear as simply a "matter of phrasing," its discussion is necessary because "phrasing mirrors thought, and it is important that the phrasing not obscure the true issue" before the Court. *Wright v. West*, 505 U.S. 277, 304–05 (1992) (O'Connor, J., concurring) (quoting *Brown*, 344 U.S. at 501). Regardless of which conception of "unreasonable application" is applied, the result is the same in this case—the California Supreme Court applied the *Strickland* prejudice test in an unreasonable fashion.

In *Williams*, the Supreme Court explained that "unreasonable" is a common term in the legal world and is to be measured objectively in the AEDPA context. *Williams*, 529 U.S. at 409–10. Although the term "unreasonable" may

be difficult to define in some scenarios, we know it means more than being merely erroneous or incorrect. *Id*. at 410–11.

Later, in explaining how § 2254(d) interacts with the *Strickland* test, the Supreme Court introduced the concept of "double deference." Double deference refers to the layering of the reasonableness test from § 2254(d) on top of another reasonableness test, such as the deficiency prong of *Strickland*'s two part standard. Because only the prejudice prong is at issue here, double deference does not apply.[10]

More recently, the Supreme Court expressed the AEDPA standard slightly differently. In *Harrington v. Richter*, the Court phrased the application of *Strickland* under § 2254(d)(1) as "whether it is possible fairminded jurists could disagree" that theories or arguments the state court could have relied on were inconsistent with a prior Supreme Court decision. 562 U.S. 86, 101–02 (2011). This "fairminded

---

[10] Double deference applies when a federal court is reviewing a state court's application of a general rule. *Knowles v. Mirzayance*, 556 U.S. 111 (2009) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The more specific a legal rule is, the more narrow a range of reasonable application exists for that rule. *Yarborough*, 541 U.S. at 664. *Strickland's* deficiency prong presents a general rule because "[j]udicial scrutiny of counsel's performance must be highly deferential" and there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." 466 U.S. at 687–88. Because "[t]here are countless ways to provide effective assistance in any given case," courts must be hesitant in performing a post-hoc review of trial counsel's strategic choices. *Id.* at 689. Thus, the federal court asks whether it was reasonable for the state court to find whether trial counsel's performance fell within the range of reasonable professional assistance. Because the prejudice prong of *Strickland* presents only a more specific legal rule, a case considering only that prong is not subject to double deference as described in *Mirzayance*.

jurist" phrasing has oft been repeated since *Richter* in the AEDPA/*Strickland* context. *See, e.g.*, *Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015); *Pinholster*, 563 U.S. at 188; *Andrews v. Davis*, 798 F.3d 759, 774 (9th Cir. 2015).

In *Williams*, the Supreme Court explained that the "reasonable jurist" standard is an objective standard and is not the proper standard for determining what amounts to an "unreasonable application" under § 2254(d)(1). 529 U.S. at 409 ("The placement of this additional overlay on the 'unreasonable application' clause was erroneous."). Because *Richter* cited *Williams* approvingly, and because no Supreme Court decision has overruled *Williams*, it is clear that the "fairminded jurist" language in *Richter* is just an alternative way to describe the objective unreasonableness standard elucidated in *Williams* and not a new subjective standard.[11]

Applying an objective fairminded jurist standard does not mean that because any state judge found otherwise, the federal court is obliged to turn away a petitioner. *Cf. Wright v. West*, 505 U.S. 277, 304 (1992) (O'Connor, J., concurring). Indeed, to do so would wholly negate § 2254 and function as a suspension of the writ of habeas corpus for state prisoners. It would mean that even were a state prisoner granted a writ by a state trial court, the government could appeal all throughout the state process and lose each step of the way but so long as one jurist on either the state appellate court or state supreme court dissented, any federal petition would be

---

[11] The dissent clings to a subjective interpretation of the Supreme Court's "fairminded jurist" language, insisting § 2254(d) cannot be met because the California Supreme Court and the federal district court came to a different conclusion. Under this interpretation, there would be no reason for a federal appellate court to ever hear § 2254(d) appeals.

doomed to failure. Courts are to read laws in order to give them meaning, not to render them fully impotent. *See Williams*, 529 U.S. at 404.

Under any reading of § 2254(d), we conclude that Hardy is entitled to relief. We must determine whether the California Supreme Court applied the prejudice prong of *Strickland* in an unreasonable manner. It did.

The relevant inquiry under *Strickland*'s prejudice prong is "whether it is reasonably likely the result would have been different" had counsel not performed deficiently. *Cannedy v. Adams*, 706 F.3d 1148, 1162 (9th Cir. 2013) (quoting *Harrington*, 562 U.S. at 111–12). A court must "compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately." *Thomas v. Chappell*, 678 F.3d 1086, 1102 (9th Cir. 2012) (quoting *Karis v. Calderon*, 283 F.3d 1117, 1133 (9th Cir. 2002)). As described in detail in part II, if Demby had provided effective assistance of counsel, the State's theory of the case that Hardy was the actual killer would have been eviscerated. If Demby had investigated Boyd and then presented evidence that he made incriminating statements before and after the murder, and that his alibi was false, the jury would have been torn between two conflicting theories on the identity of the second killer. This would have created a reasonable doubt as to Hardy's guilt. To the extent the California Supreme Court concluded there was not a substantial likelihood of a different result, it did not simply arrive at an incorrect conclusion about prejudice but it applied the *Strickland* prejudice prong in an objectively unreasonable manner.

Hardy is entitled to relief based on the severity of Demby's deficiency, the vital role Boyd's testimony played in securing Hardy's convictions, the lapses of the prosecution, and the utter dearth of other evidence inculpating Hardy.

## Conclusion

Hardy was deprived of effective assistance of counsel at his trial and has demonstrated *Strickland* prejudice therefrom. Hardy's attorney failed him, and the State of California failed Hardy by putting a man on the stand that it should have known committed the crime. We are not in a position to determine if, or to what extent, Hardy may have been involved in these heinous murders. But we can, and do, find that when the California Supreme Court failed to find ineffective assistance of counsel, its denial of Hardy's claim was both contrary to and objectively unreasonable under *Strickland*. Accordingly, Hardy is entitled relief under AEDPA. We **REVERSE** the district court's judgement and **REMAND** the case to the district court with instructions to grant the petition for a writ of habeas corpus.

**REVERSED** and **REMANDED**.

CALLAHAN, Circuit Judge, dissenting:

This is a standard habeas case governed by AEDPA that requires us to evaluate the reasonableness of the state court's determination that an error—here, an error made by defense counsel—was not prejudicial. In a unanimous 57-page opinion, the California Supreme Court found that under *Strickland v. Washington*, 466 U.S. 668 (1984), James

Edward Hardy did not receive competent representation from his trial lawyer, who failed to discover evidence tending to show that Hardy was *not* the person who stabbed the mother and child to death. *In re Hardy*, 41 Cal. 4th 977, 1019–21 (2007). Accordingly, the California Supreme Court vacated his death penalty. Applying *Strickland*'s prejudice test, however, the court affirmed his conviction as a conspirator and an aider and abettor, because the overwhelming evidence of Hardy's participation in the crime was not undermined by the post-conviction evidence suggesting that another person did the actual stabbing. *Id.* at 1021–30.

The only issue certified by the district court for appeal is the California Supreme Court's determination that Hardy has failed to show that his conviction as a conspirator and abettor was undermined by his trial attorney's failure to uncover evidence that another person butchered the victims. Under AEDPA, we may not grant relief unless Hardy shows that the California Supreme Court's decision applied *Strickland* in an "objectively unreasonable" manner. *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015).

As recently reaffirmed in our en banc opinion, where "it is possible to read the state court's decision in a way that comports with clearly established federal law . . . we must do so." *Mann v. Ryan*, —F.3d—, 2016 WL 3854234, at *11 (9th Cir. 2016) (en banc). This reflects the Supreme Court's admonishments in *Ayala* that:

> under AEDPA, "a federal court may not award habeas relief under § 2254 unless the *harmlessness determination itself* was unreasonable." And a state-court decision is not unreasonable if "'fairminded jurists could

> disagree' on [its] correctness." [A petitioner]
> therefore must show that the state court's
> decision to reject his claim "was so lacking in
> justification that there was an error well
> understood and comprehended in existing law
> *beyond any possibility* for fairminded
> disagreement."

135 S. Ct. at 2199 (internal citations omitted) (second emphasis added).

Rather than follow the Supreme Court's directions, the majority manufactures a legal standard that the state supreme court never utilized and refuses to recognize the reasonableness of the alternative bases of guilt identified by that court. Because the majority's rationale and conclusion are contrary to AEDPA and to the Supreme Court's opinions interpreting the AEDPA standard of review, I dissent.

## I.    Background

Thirty-seven years ago, at the behest of Clifford Morgan, Mark Anthony Reilly and Hardy plotted to murder Morgan's wife, Nancy, and their eight-year-old son, Mitchell. In exchange for their hard work, Morgan promised to reward the two handsomely, with money from the insurance proceeds he intended to collect from the deaths. The morning after Morgan gave final approval to proceed with the murders, a neighbor found Nancy's and Mitchell's bloody, lifeless bodies in the bedroom of the Morgan's Van Nuys home. The two had been knifed to death—Morgan's wife had been stabbed 45 times and their son 21 times.

Morgan, Reilly and Hardy were arrested for the killings and charged with first degree murder and conspiracy to commit murder to collect life insurance proceeds. Cal. Penal Code §§ 182, 187. The amended information listed 24 overt acts committed by the men in furtherance of the conspiracy. The acts involving Hardy include:  taking an M–1 rifle from the Morgan home on May 20 or 21 to make the murders appear to have been committed in the course of a robbery/burglary; participating in the arrangements the trio made to ensure that Morgan would be out of town when the murders took place; receiving instruction from Reilly as to how to commit the murders; meeting Reilly on May 20 to formulate their alibi with Colette Mitchell; and accompanying Reilly to burglarize the Morgan home, which Reilly accomplished by using a key supplied by Morgan to gain entry, and bolt cutters to disguise the purpose of the killings. Because the conspiracy continued after the murders took place, the information also listed several acts committed by Hardy while in pre-trial custody:  he assisted Reilly in fabricating an alibi and/or a confession or testimony to enable Morgan to collect insurance proceeds, and a defense that would pin the murders on someone else; he communicated with Reilly over 60 times and joined him in conveying to other co-conspirators testimony given at the preliminary hearing, and in "formulat[ing]" their hearing testimony; and he arranged to have his brother dispose of the M–1 rifle taken from the Morgan home.

Hardy, Reilly and Morgan were tried together in Los Angeles County Superior Court.  At trial, Debbie Sportsman, Reilly's girlfriend, and Colette Mitchell, Hardy's girlfriend, provided key testimony linking Hardy to the murders. Sportsman testified that Hardy kept company with Reilly in the days before and after the murders.  She also recounted

that Hardy was present in Reilly's apartment during Reilly's telephone conversation with Morgan several hours before the killings. Colette testified that she was with Hardy the night before the murders and that, although she was not sure whether Hardy left the apartment between 2 a.m. and 11 a.m. the following day, he told her on two occasions that he had been to the victims' home on the night of the murders. Hardy frequently discussed his alibi with her in the days following the murders and told her that bolt cutters had been used to enter the victims' house. He also told her that Reilly was in charge, that insurance proceeds were the reason for the killing, and that Morgan was not worried about the delay caused by the trial because his insurance proceeds were earning 12 ¾ percent interest. Colette further recalled that Hardy received $1,000 in $100 bills after the murders. Finally, Colette testified that as a pre-trial detainee, Hardy instructed her to destroy a pair of shoes that he feared would match a footprint discovered at the crime scene, and to help him dispose of an M–1 carbine rifle allegedly stolen from Morgan's home.

At the State's urging, the trial court permitted the jury to consider whether Hardy conspired to commit murder, or aided and abetted the killings. Regarding conspiratorial liability, the court explained that a conspirator includes a person "who, whether present or not at the commission or attempted commission of a crime, advise[s] and encourage[s] in its commission or attempted commission." *Hardy*, 41 Cal. 4th at 1026. Such a person is "regarded by the law as [a] principal[] in the crime . . . and equally as guilty." *Id.* In defining a conspiracy, the court instructed that it is "an agreement" to commit a crime "followed by an overt act committed in this state by one of more persons of the parties for the purpose of accomplishing the object of the

agreement." *Id.* at 1027. The jury received a copy of the amended information listing the alleged overt acts. *Id.* at 1026. In turn, the prosecutor argued that "based upon the facts of this case, . . . if one conspires to commit a murder for the purposes of collecting insurance, what is it other than premeditation and deliberation [justifying a verdict of first degree murder]?" *Id.* at 1027. The prosecutor further argued: "We submit to you that Mr. Hardy joined that conspiracy, and when he joins the conspiracy, he adopts those acts [committed by Reilly and Morgan]." *Id.* at 1027–28.

The jury heard similar instructions and argument regarding aiding and abetting liability. The court defined an aider and abettor as someone who "aids, promotes, encourages or instigates by act or advice the commission" of a crime and explained that such person is "liable for the natural and reasonable or probable consequences of any act that he knowingly aided or encouraged." *Id.* at 1029. The prosecutor argued this theory of guilt to the jury: "[i]f you find that this is a first degree murder and if you find that each one of these individuals [Hardy, Morgan and Reilly] participated in that, either by aiding, abetting, by personally becoming involved, by encouraging, by soliciting, by aiding and abetting, each one of them individually [is guilty of first degree murder]." *Id.* at 1029–30 (second brackets by state court).

The jury convicted Hardy, Morgan and Reilly of two counts of first degree murder, one for Nancy and one for Mitchell. Moreover, convinced that the three participated in a scheme to murder the victims and thus were jointly culpable for the deaths regardless of who performed the actual killings, the jury separately convicted each defendant of one count of conspiracy to commit murder to collect life insurance

proceeds.  Hardy and Reilly were sentenced to death.[1]  The convictions were affirmed on direct appeal to the California Supreme Court.  *Hardy*, 2 Cal. 4th at 216.

## II.    State and Federal Habeas Proceedings

### A.  State Habeas Decision

In 2007, the California Supreme Court affirmed Hardy's conviction in state habeas proceedings.  Hardy claimed, among other things, that defense counsel unreasonably and prejudicially failed to investigate and present significant evidence indicating that he was innocent of murder and that Calvin Boyd was probably the person who killed Nancy and Mitchell Morgan.    An evidentiary hearing revealed incriminating evidence against Boyd.  The court found that this evidence, while failing to demonstrate Hardy's innocence, created substantial doubt that he personally stabbed the victims, thus undermining confidence in the sentence.  The court vacated Hardy's death sentence on this basis.[2]

The court upheld the guilty verdict, however, because counsel's failure to discover and present the Boyd evidence did not undermine confidence in the jury's determination that

---

[1] The jury did not get the opportunity to consider Morgan's sentence. The trial court severed his penalty phase trial from the other defendants when it was discovered that his health was failing due to cancer. *Hardy*, 41 Cal. 4th at 987; *People v. Hardy*, 2 Cal. 4th 86, 128, 197 (1992), *modified on denial of reh'g* (May 14, 1992).  Morgan died before the penalty phase of his separate trial could be held.  *Id.*

[2] In 2010, Hardy was re-sentenced to two consecutive life terms without the possibility of parole plus a consecutive prison term of 25 years to life.

Hardy was guilty of murder as a co-conspirator. *Hardy*, 41 Cal. 4th at 1021–30, 1036. Recognizing *Strickland*'s requirement that a defendant establish the prejudice he has allegedly suffered because of counsel's deficient representation, the court required Hardy to show that "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different.'" *Id.* at 1018 (quoting *In re Avena*, 12 Cal. 4th 694, 721 (1996)).[3] Based on Supreme Court precedent, the court defined "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.*

Guided by these principles, the California Supreme Court considered whether post-conviction evidence that Boyd stabbed the victims undermined confidence in the guilty verdict. The court did so by "weighing [the] evidence and considering what petitioner's trial would have looked like had he been represented by competent counsel." *Id.* at 1030. The court recognized that "although the prosecutor proceeded primarily on the theory that petitioner was the actual killer, he also presented to the jury two theories of derivative liability: conspiracy, and aiding and abetting." *Id.* at 1025. Citing the accusatory instrument, the jury instructions and the prosecutor's closing arguments, the court found that the prosecution had adequately presented both alternative theories for the jury's consideration. The court then determined that Debbie Sportsman's and Colette Mitchell's testimony "strongly" demonstrated that "[Hardy] conspired with, and aided and abetted, Reilly, Morgan and others" to kill Nancy and Mitchell Morgan for financial gain. *Id.* at 1028–30. The court concluded that Hardy failed to meet

---

[3] The standard quoted in *Avena* is excerpted from *Strickland*. *Avena*, 12 Cal. 4th at 721 (quoting *Strickland*, 466 U.S. at 694).

*Strickland*'s prejudice prong as to his guilt as a conspirator and an abettor.

## B.  Federal Habeas Decision

Hardy challenged the California Supreme Court's 2007 decision in habeas proceedings in federal court.  The district court denied his petition but certified one issue for appellate review:  whether the California Supreme Court reasonably concluded that Hardy was not prejudiced as a result of counsel's failure to uncover and expose the fact that Boyd was the likely killer.  This is the narrow question we must answer on appeal.

## III.    Standard of Review

We review the district court's decision de novo, but apply AEDPA's "highly deferential standards" to the underlying state court decision.  *Ayala*, 135 S. Ct. at 2198; *Mann*, 2016 WL 3854234, at *7.   Under AEDPA, a claim that is adjudicated on the merits in state court may be reviewed by a federal court only to determine whether its adjudication was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) was "based on an unreasonable determination of the facts in light of the evidence presented at the State Court proceeding."  28 U.S.C. § 2254(d); *Ayala*, 135 S. Ct. at 2198.  The Supreme Court continues to require that we rigorously apply AEDPA's deferential mandate.   *Ayala*, 135 S. Ct. at 2198–99; *Harrington v. Richter*, 562 U.S. 86, 100–04 (2011).  As part of that mandate, we must "presum[e] that state courts know and follow the law," we must give state courts "the benefit of the doubt," and we must make an "effort to reconcile" state

courts' reasoning with clearly established law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

## IV.    Deference to the California Supreme Court Is Required

### A.  The California Supreme Court's Correct Application of *Strickland*'s "Reasonable Probability" Standard

Under AEDPA's "contrary to" clause, we examine whether "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." *Mann*, 2016 WL 3854234, at *7 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)).

Here, the state court began its prejudice analysis by reciting the *Strickland* standard verbatim, setting forth the "reasonable probability" test. It then proceeded to conduct three critical inquiries derived from the Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005). In *Rompilla*, the Supreme Court found *Strickland* prejudice where counsel failed to discover mitigating evidence about the petitioner's disadvantaged background. 545 U.S. at 390–93. Had counsel investigated his client's imprisonment record, the Court held, he would have discovered critical information that would likely have influenced the jury not to sentence him to death. *Id.*

Based on *Rompilla*, the California Supreme Court assessed Hardy's prejudice claim by asking: "What evidence was available that counsel failed reasonably to discover? How strong was that evidence? How strong was the evidence

of guilt produced at trial?" *Hardy*, 41 Cal. 4th at 1021–22 (citing *In re Thomas*, 37 Cal. 4th 1249, 1265 (2006)).[4] The court answered each of these questions, beginning with a recap of the new evidence implicating Boyd in the murders. The court then analyzed the trial evidence purporting to show that Hardy personally stabbed the victims and determined that the evidence was "weak and circumstantial." *Id.* at 1022. Finally, the court considered what trial evidence linked Hardy to the murder conspiracy and determined that the testimony from Hardy's and Reilly's girlfriends supported not only that theory, but also the State's aiding and abetting theory of guilt. The California Supreme Court's measured approach led to the principled decision to affirm Hardy's conviction. *Hardy*, 41 Cal. 4th at 1036.

The majority cannot bring itself to defer to the California Supreme Court's conclusion or methodology, however. To circumvent AEDPA, the majority fragments the state court opinion in a way that distorts the court's prejudice formulation, making it appear as if the court embraced a test that was "contrary to" *Strickland.* In so doing, the majority defies Supreme Court precedent and our recently reaffirmed mandate that we *must* "read the [state court] decision to comport with clearly established federal" where it is possible to do so. *Mann*, 2016 WL 3854234, at *11; *see Visciotti*, 537 U.S. at 24.

In *Mann*, we applied this principle to a state court decision where "the court did not clearly state the [prejudice] standard it applied." *Mann*, 2016 WL 3854234, at *11. We

---

[4] Although the California Supreme Court cites to its decision in *Thomas*, *Thomas* expressly relies on *Rompilla*'s prejudice approach. *Thomas*, 27 Cal. 4th at 1265.

"[r]ead[] the opinion as a whole" and made the "logical inference" that the state court applied the correct "reasonable probability" standard and not, as the petitioner contended, the "more-likely-than-not" standard. *Id.* We based our conclusion on various factual findings relevant to the petitioner's mitigation profile and the state court's reference to a "controll[ing]" Arizona Supreme Court decision adopting the "reasonable probability" standard. *Id.*

Much like the petitioner in *Mann*, the majority argues that the state court employed a prejudice test that was "significantly harsher than the clearly established test from *Strickland*," "creat[ing] a much higher bar for Hardy than the law require[s]." Maj. Op. 30, 32. The majority opines that the state decision applied a "substantial evidence" test—relevant to a sufficiency-of-the-evidence challenge—that impermissibly burdened Hardy with "demonstrat[ing] that had counsel performed adequately there would not have been sufficient evidence for a jury to convict" him. Maj. Op. 31.

The California Supreme Court made no such blunder. The court used the term "substantial evidence" interchangeably with "ample evidence" or "overwhelming evidence" to underscore the strong evidence of Hardy's guilt as a conspirator and an abettor.[5] Given that the court's

---

[5] *See Hardy*, 41 Cal. 4th at 1029 ("there is ample evidence showing [Hardy] participated in the plan to kill the victims as part of a wider conspiracy"); *id.* at 1030 ("For much the same reasons we found substantial evidence supported a conspiracy theory of liability for first degree murder, we also find substantial evidence supports an aiding and abetting theory of liability. To recap: Overwhelming evidence tied Reilly to the conspiracy and the murders . . ."); *id.* ("[W]e conclude that although there is a reasonable probability the jury would not have convicted [Hardy] on the prosecution's proffered theory that he was the actual killer,

opinion "painstakingly describes the *Strickland* standard," its use of the term "substantial" and not another modifier of the majority's choosing "may perhaps be imprecise, but . . . it can no more be considered a repudiation of the standard than can [the Supreme] Court's own occasional indulgence in the same imprecision." *Visciotti*, 537 U.S. at 23–24. The California Supreme Court found that Hardy failed the "reasonable probability" test because the evidence that counsel failed to discover was of minimal weight as to Hardy's participation in the murders, and was overwhelmed by other evidence of his role as a conspirator and as an aider and abettor.[6]

The majority assumes the worst of the state supreme court, however, refusing to even attempt to reconcile the state court's use of the term "substantial evidence" with its proper framing of the *Strickland* prejudice standard. *See id.* at 24. "This readiness to attribute error is inconsistent with the presumption that state courts know and follow the law.'"[7]

---

ample evidence remains that [he] was guilty of the murders on the alternative theories[.]"); *id.* at 1036 ("there being ample evidence [Hardy] was a coconspirator in the scheme to kill the victims").

[6] The missing evidence did, however, carry weight with respect to the sentence, as it tended to show Hardy might not have played the lead role in the murder conspiracy. Accordingly, the state court remanded for re-sentencing.

[7] This presumption is especially compelling here, where the state court knew when to examine the record for substantial evidence—i.e., when reviewing the factual and credibility determinations of the reference hearing referee. *Hardy*, 41 Cal. 4th at 993 ("[W]e give great weight to those of the referee's findings that are supported by substantial evidence. This is especially true for findings involving credibility determinations. . . . [Hardy] is entitled to challenge the referee's findings, both on the ground that they are not supported by substantial evidence and

*Mann*, 2016 WL 3854234, at *11 (quoting *Visciotti*, 537 U.S. at 24). "Taken in context," the California Supreme Court's prejudice discussion demonstrates the great care the court took in weighing the evidence to determine whether the jury would have acquitted Hardy of murder under *all* theories of guilt had his attorney performed adequately. *Id.*; *see Williams*, 529 U.S. at 398–99 (upholding the state trial judge's "[*Strickland* prejudice] conclusion that the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally, raised 'a reasonable probability that the result of the sentencing proceeding would have been different' if competent counsel had presented and explained the significance of all the available evidence").

"If [the *Strickland*] standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102. The Supreme Court has explained that a petitioner's "reasonable probability" showing must be "substantial, not just conceivable." *Id.* at 111–12 (citing *Strickland*, 466 U.S. at 693). The majority acknowledges this requirement but somehow construes it to lighten a petitioner's *Strickland* burden. Maj. Op. 30–31. It is the quantity and quality of trial evidence, as impacted by counsel's errors, that determines whether the probability of reasonable doubt is "substantial" or, as here, "just conceivable." *See Williams*, 529 U.S. at 397–99.

The majority's misinterpretation of the California Supreme Court's opinion reflects its failure to appreciate the issues raised in this appeal. The majority's opinion "ignore[s] 'the only question that matters'" in this case:

---

for accuracy[.]"); Maj. Op. 30 n.5 (acknowledging proper application of "substantial evidence" standard to referee findings).

"whether the state court's application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 102 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)). The proper inquiry would force the majority to consider "what arguments or theories"—here, for example, key testimony from Debbie Sportsman and Colette Mitchell—"supported . . . or could have supported" the state supreme court's determination that the jury verdict would not have changed had the missing evidence been presented. *Id.*

## B. Reasonableness of the California Supreme Court's Prejudice Determination

In determining the reasonableness of a state court decision, the Supreme Court requires that we not only consider the reasons offered by the state court, but also "what arguments or theories supported or . . . *could* have supported, the state court's decision." *Id.* (emphasis added). We are directed to then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Id.* Applying these principles, the Supreme Court has held that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The California Supreme Court's decision reflects its masterful grasp of the State's multi-faceted case and why, in light of these nuances, *Strickland* precludes relief. In assessing the integrity of the jury verdict, the court examined the State's approach to the defendants' prosecution from arraignment to verdict. At the outset, it observed that the

amended information charged Hardy with conspiracy and alleged a series of overt acts committed by Hardy in furtherance of the conspiracy.  It then pointed to all the evidence—including the testimony of Debbie Sportsman and Colette Mitchell—that bore out these allegations.  The damning evidence is worth repeating:  Hardy and Reilly began associating with each other in the days leading up to the murders; Hardy was with Reilly in Reilly's apartment when Morgan gave final approval to proceed with the murders; Hardy rehearsed his alibi with Colette frequently in the days following the murders; Hardy knew critical details about the crimes, including that life insurance proceeds were the reason underlying and payment for the murders; Reilly played a leadership role in the planning efforts; Hardy received $1,000 cash after the murders; and Hardy instructed Colette regarding the disposal of potentially incriminating evidence.  *Hardy*, 41 Cal. 4th at 1028–30.  Based on all the evidence, the prosecutor during summation called the jurors' attention to the conspiracy and aiding and abetting instructions provided by the trial court and urged them to convict the three defendants as co-conspirators and as aiders and abettors to murder.  The jury agreed, returning verdicts of first degree murder *and* conspiracy to commit murder.

The majority nonetheless chastises the California Supreme Court for accepting the way in which the State prosecuted its case.  It myopically insists that the prosecution's entire case rose and fell on the theory that Hardy was the actual killer, but this is refuted by the record and the jury's verdict.  Even if there were less evidentiary support for the California Supreme Court's decision, the majority would still be bound by the Supreme Court's clear instruction to consider "what arguments or theories supported or . . . could have supported, the state court's decision."

*Richter*, 562 U.S. at 102; *see Visciotti*, 537 U.S. at 27 ("[U]nder § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. The federal habeas scheme leaves primary responsibility with the state courts for these judgments.").

The majority's contrary assessment of the evidence and legal arguments in this case turns on two errors of law. First, the majority asserts that "an aid-and-abet theory is wholly distinct from an actual killer theory and the jury could not simultaneously have found both true." Maj. Op. 34–35. But as we have recognized, the law permits the State to present factually inconsistent theories of guilt, within constitutional limits of course. *See Taylor v. Beard*, 811 F.3d 326, 327, 331 (9th Cir. 2016) (en banc) (state argued principal and aiding-and-abetting theories in the alternative). The majority's logic begs the question: having charged Hardy with first degree murder, what leverage would the prosecution have gained by a conspiracy count, or an aiding-and-abetting instruction, premised on Hardy's culpability as the actual killer? Nothing at all, since Hardy would be acting as a principal under all three theories of guilt.

Second, contrary to principles of conspiratorial liability, the majority contends that the acts Hardy committed in furtherance of the conspiracy are too "minor" to render him culpable for murder. Maj. Op. 36. A conspiracy requires the commission of an overt act but does not distinguish between

major and minor acts.**[8]** As the California Supreme Court held on direct appeal, the conspiracy in this case was primarily one to defraud insurance companies. *Hardy*, 2 Cal. 4th at 143–44. The conspiracy continued until the co-conspirators received the insurance proceeds, or until Morgan was convicted of murder. *Id.* at 144. Because the proceeds had not yet been paid at the time of trial, *any* of Hardy's overt acts committed between the agreement to defraud and the trial—however minor that act may be in the eyes of the majority—was a cognizable basis for convicting him of conspiracy to commit murder to collect life insurance.

The majority's fixation on the fact that *part* of the State's case hinged on an actual killer theory undoubtedly clouds its judgment on habeas review. It deliberately ignores the other theories of culpability advanced by the prosecution and points

---

**[8]** As recited by the California Supreme Court:

> A conspiracy is an agreement entered into between two or more persons with the specific intent to agree to commit a public offense and with the further specific intent to commit such offense, followed by an overt act committed in this state by one or more of the parties for the purpose of accomplishing the object of the agreement.

> In order to find a defendant guilty of conspiracy, in addition to proof of the unlawful agreement and specific intent, there must be proof of the commission of at least one of the overt acts alleged in the information. It is not necessary to the guilt of any particular defendant that he himself committed the overt act, if he was one of the conspirators when such an act was committed.

*Hardy*, 41 Cal. 4th at 1027 (quoting jury instructions).

only to the evidentiary shortcomings undermining the prosecution's assertion that Hardy did the actual stabbing. But the California Supreme Court did not hide the ball with respect to these weaknesses. It recognized that no one reported seeing Hardy leave Reilly's apartment the night of the murders; no witnesses placed Hardy at the crime scene; no blood, fingerprint, footprint, hair or other forensic evidence linked him to the crimes; and no murder weapon was recovered. Such evidence could have shored up the prosecution's actual killer theory. But the shortcomings of the State's principal liability theory did not necessarily undercut its alternative case for conspiracy. So long as the State proved that Hardy intentionally participated in the murder plot, its case against all three defendants remained strong.

The majority's dismissive attitude towards the state court's careful treatment of the jury verdict is contrary to the Supreme Court's repeated instruction "not . . . to substitute its own opinion for the [state court's] determination." *Ayala*, 135 S. Ct. at 2202. At this point, the Supreme Court's AEDPA instructions to the Ninth Circuit might sound like a broken record. *See Visciotti*, 537 U.S. at 22–27; *Deck v. Jenkins*, 814 F.3d 954, 986–87 & n.1 (9th Cir. 2016) (en banc) (M. Smith, J., dissenting) (citing Supreme Court cases reversing Ninth Circuit's grant of AEDPA relief). The majority blithely marches forward to the beat of its own drum, however, substituting its judgment for that of the state supreme court. It discounts Debbie Sportsman's "few circumstantial statements" regarding Hardy's role in the murders. Maj. Op. 37. It also discredits Colette Mitchell's testimony, cherry-picking statements from the state court opinion that acknowledge weaknesses in her testimony. Maj. Op. 37–38. But the California Supreme Court made those

acknowledgments only for purposes of assessing Hardy's guilt as the actual killer and plainly accepted Colette's testimony as supporting the jury's conspiracy verdict.[9]  *See Hardy*, 41 Cal. 4th at 1023–25, 1028–30.  Only by substituting its evaluation of the evidence for that of the jury—the very process forbidden by the Supreme Court—can the majority conclude that the California Supreme Court's decision was unreasonable.

## V.    Conclusion

The California Supreme Court's meticulous opinion comports with *Strickland*.  The court recited *Strickland*'s "reasonable probability" standard and faithfully applied it, inquiring whether counsel's inadequate performance would have undermined confidence in the guilty verdict.  The court concluded that the representation undermined the theory that Hardy actually stabbed the victims, thus prejudicing the death penalty verdict and justifying its vacatur.  The court found no additional prejudice to the conviction, however, because critical post-conviction evidence did not blot out the substantial trial evidence establishing that Hardy conspired to

---

[9] The majority asserts that the observations the state supreme court made in rejecting Hardy's claim of innocence are "equally applicable" to his ineffective assistance of counsel claim.  Maj. Op. 34.  The rationale is flawed, however, because actual innocence claims and ineffective assistance of counsel claims are governed by separate and distinct legal standards.  *Compare Hardy*, 41 Cal. 4th at 1016, 1018 (rejecting actual innocence claim where "the allegations . . . fail to undermine the prosecution's entire case against [Hardy] or point unerringly to his innocence or reduced culpability"), *with id.* at 1036 (rejecting ineffective assistance of counsel claim where the "new evidence does not undermine our confidence that the jury would nevertheless have convicted [Hardy] of murder by relying on a conspiracy theory").

commit, and aided and abetted, the murders. This was not an objectively unreasonable conclusion given the overwhelming evidence connecting Hardy to the conspiracy. And even if the conclusion were erroneous, under AEDPA, we are not authorized to re-weigh the evidence to correct it.

This is not the first time that we have gotten the "unreasonableness question" wrong. In *Richter*, the Supreme Court reprimanded us for

> treat[ing] the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that Richter's *Strickland* claim had merit, the Court of Appeals concluded the state court must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court's result and ignores further limitations of § 2254(d), including its requirement that the state court's decision be evaluated according to the precedents of this Court. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

562 U.S. at 102 (internal citation omitted). The majority in this case commits the very same error. *See, e.g.*, *Ayala*, 135 S. Ct. 2187; *Visciotti*, 537 U.S. 19; *Williams*, 529 U.S. 362. I agree with the justices of the California Supreme Court, the United States magistrate judge and the United States district judge that Hardy's request for habeas relief should be denied.

Somehow the Supreme Court's instructions, as plain as they are, seem to have fallen on deaf ears. My hearing is not so dull. Because the majority has turned a blind eye to AEDPA and the Court's interpretation of it, I dissent.